**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

————————————

No. 96-11296

————————————


PERRYTON EQUITY EXCHANGE,

Plaintiff-Appellee,

VERSUS

FEDERAL DEPOSIT INSURANCE CORPORATION,
as receiver for Peoples Bank & Trust;
APPLESTEIN, INC.; CHOMMACHEE, INC.;
DANDY, INC.; KETTLE, INC.; and GLENN HART,

Defendants-Appellants.


————————————————————

Appeal from the United States District Court
for the Northern District of Texas
(2:96-CV-268)

————————————————————

August 21, 1997

Before POLITZ, Chief Judge, HIGGINBOTHAM and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]


The Federal Deposit Insurance Corporation ("FDIC"), Apple-stein, Inc., Chommachee, Inc., Dandy, Inc., Kettle, Inc., and Glenn Hart appeal the federal district court's partial affirmance and partial reversal of a state court judgment against Perryton Equity

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Exchange ("Equity"). We affirm in part and reverse in part.

I.

In September 1990, the Peoples Bank and Trust (the "Bank") perfected security interests in the 1991 crops of the Applestein, Chommache, and Dandy farm operating companies (collectively, the "Operating Companies"). Applestein is owned by Glenn Hart and Kim Malone. Chommache is owned by Kim Malone and Howard Shelley; Jeff Hart (Glenn's son) is its sole director. Dandy is owned by Howard Shelly and Jeff Hart.

In April 1991, the Operating Companies sought to acquire credit from Equity, a grain silo and fertilizer and chemical supplier to the agricultural industry, with which they could purchase fertilizer and other supplies. Equity agreed, but on the condition that the Bank subordinate its security interests in the 1991 crops to those of Equity. The Bank acceded to this request and, during the spring and summer of 1991, Equity provided goods and services to the Operating Companies on open account.

In June 1991, each of the Operating Companies entered into a written wheat sale agreement with the Howard Shelly Seed Company ("Shelly Seed") under which each of the Operating Companies was to deliver to Shelly Seed its 1991 seed wheat, and Shelly Seed was to store and sell the seed wheat. Although the parties contest the nature of the agreements, on their face they appear to be consignment agreements, with each of the Operating Companies

retaining title to the seed wheat until the consummation of any sales. The Operating Companies were to receive the first $2.75 per bushel of sale proceeds, with any additional amounts over $2.75 to be split evenly between the Operating Companies and Shelly Seed.

Later that month, seed wheat began arriving at Shelly Seed from the Operating Companies, some of which seed wheat Shelly Seed stored at Equity. Although the incoming seed wheat was recorded on Shelly Seed weight tickets, Equity transferred the information contained on the tickets to Equity weight tickets and recorded the tickets in the name of the respective Operating Company that retained title to the wheat. By June 25, 1991, Equity was storing 107,100 pounds of wheat owned by Applestein, 405,380 pounds owned by Chommache, and 293,480 pounds owned by Dandy.

In August 1991, Joel Hart, an employee of Hart & Sons, a company that provides bookkeeping services to the Operating Companies, became concerned that some of the seed wheat belonging to the Operating Companies was being accounted for improperly. As a result, Joel instructed Jack Osborn, an Equity representative, not to release any seed wheat to Shelly Seed without first contacting Hart & Sons. Notwithstanding this instruction, Equity permitted Shelly Seed to remove seed wheat from Equity later that month. According to Osborn, he did not notify Hart & Sons of this fact because the seed wheat was being removed on Hart & Sons's trucks, and he assumed therefore that Joel was aware of the seed wheat's being removed.

II.

In December 1991, Equity made demand upon the Operating Companies and the Bank for amounts allegedly due on the open accounts and security agreements. The Operating Companies sought setoffs for the "unaccounted for" seed wheat that had been stored by Equity.

In response, Equity filed the instant action in Texas state court seeking recovery on the open accounts, and the Operating Companies and the Bank counterclaimed for breach of contract and conversion. A jury, after determining that Equity had maliciously converted wheat owned by the Operating Companies, eventually awarded Equity $46,192.07 against the Operating Companies and awarded the Operating Companies $142,136.77 against Equity. Although the jury found that the Bank had failed to honor its subordination agreement with Equity, it also found that Equity had suffered no damages as a consequence. The court also awarded Equity attorneys' fees and prejudgment interest.

The Texas Court of Appeals reversed in part and affirmed in part. The court concluded that Shelly Seed was entitled to possession of the Applestein seed wheat and thus that Equity's delivery of it to Shelly Seed was not a conversion. The court also reversed the exemplary damages awarded each of the Operating Companies on the conversion claims, noting that there was insufficient evidence to support the jury's finding of malice. Furthermore, the court affirmed Equity's award of attorneys' fees

4

and prejudgment interest and reversed and remanded the jury's finding that Equity had not suffered any damages from the Bank's breach of the subordination agreement.

The parties sought review in the Texas Supreme Court, but the Bank was declared insolvent in May 1996, prior to the court's issuing a decision. The FDIC was appointed receiver for the Bank and removed to federal district court pursuant to 12 U.S.C. § 1819 and *Federal Deposit Ins. Corp. v. Meyerland Co.* (*In re Meyerland Co.*), 960 F.2d 512 (5th Cir. 1992) (en banc), *cert. denied*, 506 U.S. 1049 (1993). The district court adopted the judgment of the Texas Court of Appeals, as we had directed in *Meyerland*, *id.* at 520.

III.

A.

The FDIC contends that the federal district court erred in holding that Shelly Seed was entitled to possession of the Applestein seed wheat and thus that Equity did not convert Applestein property. According to the FDIC, Shelly Seed was divested of its right to possession of the Applestein wheat seed when Joel Hart instructed Equity not to release any wheat to Shelly Seed without prior approval of Hart & Sons. We agree with the FDIC that Equity's wrongful release of the seed amounted to a conversion.

5

It is important to distinguish between two separate bailment contracts, one between Applestein and Shelly Seed and the other between Applestein and Equity. Neither party contests that the latter agreement is a true bailment contractSSEquity retained possession rights only to the Applestein seed wheat. As bailee, Equity is required to return the property to, or at the direction of, Applestein, the bailor. *See English v. Dhane*, 294 S.W.2d 709, 711 (Tex. 1956).

Although the nature of the former agreement is contested, we agree with the FDIC that it, too, is a bailment contract. "A 'sale' is defined as '[a] contract between two parties . . . by which the [seller] . . . transfers to the [buyer] the title and possession of property . . . as distinguished from a special interest falling short of complete ownership.'" *Franklin v. Jackson*, 847 S.W.2d 306, 308 (Tex. App.SSEl Paso 1992, writ denied) (citation omitted). Title must be transferred to, and vested in, the transferee in order for the transaction to be treated as a sale. *See id.;* TEX. BUS. & COMM. CODE ANN. § 2.106 (Vernon 1994). Where a contract expressly or impliedly requires that the property be returned to the owner, it is a bailment and not a contract of sale. *See Franklin*, 847 S.W.2d at 309.

Paragraph 6 of the Applestein-Shelly Seed agreement notes that "[a]ll rights and title to this seed wheat shall remain with Applestein Inc. until seed wheat is contracted and proceeds are

received by Applestein Inc." This reservation of title by Applestein makes lucid the nature of the agreement as one of bailment, rather than sale. As bailee, Shelly Seed is required to return the property to, or at the direction of, Applestein, the bailor. *See English*, 294 S.W.2d at 711.

Joel Hart, acting as Applestein's agent, instructed Osborn, as Equity's agent, not to release its seed wheat to Shelly Seed. Because Shelly Seed, as bailee, was not entitled to unfettered possession of the seed wheat, except at the direction of Applestein, Equity's release of the seed wheat to Shelly Seed effected a conversion.[2] We therefore reverse the federal district court's judgment (entered pursuant to the decision of the state court of appeals) setting aside the conversion verdict in favor of Applestein.

## B.

The FDIC next argues that the district court erred in finding that there was insufficient evidence to support an award of punitive damages on the conversion claims. According to the FDIC,

---

[2] *See Whitaker v. Bank of El Paso*, 850 S.W.2d 757, 760 (Tex. App.§§El Paso 1993, no writ) ("Conversion is the unauthorized and unlawful assumption and exercise of dominion and control over the personal property of another which is to the exclusion of, or inconsistent with, the owner's rights."). There is some confusion regarding whether Joel's instructions to Osborn orally vitiated the consignment contract between Applestein and Shelley Seed or that between Applestein and Equity. The FDIC seems to argue that the instructions effected an oral modification of the Shelly Seed contract, but Hart could not bind Shelley Seed by making an oral modification to its contract with Equity. Rather, Hart could instruct only Equity to honor the wishes of Applestein (its bailor), consistent with Applestein's obligations to Shelley Seed.

7

punitive damages are justified based upon the gross negligence and malice demonstrated by Equity in converting the Operating Companies' seed wheat to Shelley Seed.

Punitive damages for gross negligence are appropriate where the plaintiff demonstrates (1) that the act or omission, when viewed objectively from the standpoint of the actor, involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) that the actor has an actual, subjective awareness of the extreme risk involved, but nonetheless proceeds in conscious indifference to the rights, safety, or welfare of others. *See Hironymous v. Allison*, 893 S.W.2d 578, 584 (Tex. App.SSCorpus Christi 1994, writ denied) (citing *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex. 1994)). "Extreme risk" exists where there is a likelihood of serious injury to the plaintiff. *Moriel*, 879 S.W.2d at 22. Knowledge of the loss of replaceable goods is not the requisite serious harm required to support punitive damages. *See Hironymous*, 893 S.W.2d at 584.

To support its award of punitive damages for gross negligence, the FDIC points to the following facts: (1) Equity was aware that it had been instructed not to release seed wheat to Shelley Seed, but neglected to follow these instructions; (2) Equity refused to meet with representatives of the Operating Companies or to offset the amounts due with the allegedly converted seed wheat; and

8

(3) Equity refused to accept payment tendered by the Operating Companies and threatened that legal action was the sole remedy.

Items #2 and #3 are inapposite, as they deal with post-conversion conduct that does not shed light on Equity's subjective state of mind at the time of the conversion or on the objective harm potentially resulting from its allegedly grossly negligent conduct. Although item #1 indicates that Equity was in fact aware of Hart's instructions that seed wheat not be released to Shelley Seed, the FDIC fails to point to any evidence demonstrating Equity's subjective awareness of an "extreme risk."

Nor has the FDIC proffered sufficient evidence demonstrating that the act of allowing Shelley Seed to remove the seed wheat gave rise to an objective extreme risk. Rather, Osborn testified that he saw the wheat being loaded onto one of Hart's trucks and concluded from thatSSperhaps negligentlySSthat the Harts had given tacit approval to the removal of the seed. Furthermore, the loss of a certain quantum of fungible seed, under the facts of this case, is not a sufficiently serious injury to justify the imposition of punitive damages. *See Moriel*, 879 S.W.2d at 23-24 (noting that a serious injury is not that associated with a breach of contract; it must be "independent and qualitatively different from" the breach of contract.).

The FDIC also argues that the punitive damages award may be sustained on the basis of Equity's demonstrated malice. *See id.* at

9

23 n.16 (recognizing that malice is an independent ground on which to base a punitive damages instruction). To prove malice, a plaintiff must show that the defendant committed negligent acts in reckless disregard of another's rights and with indifference as to whether that party would be injured. *See Taiwan Shrimp Farm Village Ass'n v. U.S.A. Shrimp Farm Dev., Inc.*, 915 S.W.2d 61, 72 (Tex. App.SSCorpus Christi 1996, writ denied). "Malice may be implied from the knowing conversion of another's property when the defendant knew or should have known that there was no legal right to the property." *Id.*

That Equity (through Osborn) had been told by Joel Hart to notify it before permitting Shelley Seed to remove any seed wheat is insufficient, on its own, to support a finding that Equity effected a "knowing conversion." Osborn testified that he did not call Hart & Sons because, at the time the seed wheat was removed, he saw Joel Hart's car parked at Shelley Seed and that the seed wheat was being transported on Hart trucks and concluded therefrom that Joel Hart was aware that the seed wheat was being removed. At best, this demonstrates that Osborn was negligent in reaching this conclusion.[3] Thus, we affirm the federal district court's judgment

---

[3] *Cf. Taiwan Shrimp*, 915 S.W.2d at 72-73 (concluding that where the defendant admitted that it knew that the pumps belonged to the plaintiff yet proceeded to sandblast, repaint, and install the pumps in its own salt water pumping stations, there was sufficient evidence to support a knowing conversion of the pumps); *Transfer Products, Inc., v. Texpar Energy, Inc.*, 788 S.W.2d 713, 716-17 (Tex. App.SSCorpus Christi 1990, no writ) (concluding that defendant's imposition of an unreasonable storage fee, coupled with its conversion of
(continued...)

10

insofar as it sets aside the Operating Companies' exemplary damages awards.

C.

The FDIC contends that the federal district court erred in permitting Equity to recover attorneys' fees and prejudgment interest. According to the FDIC, the December 11, 1991, letters from the Operating Companies to Equity satisfy the tender provision of TEX. CIV. PRAC. & REM. CODE ANN. § 38.002(3), and Equity's rejection of such tenders therefore terminated Equity's right to claim attorneys' fees or prejudgment interest from the date of the tender.

To recover attorneys' fees in actions for performed labor, furnished materials, or express contracts, the claimant must demonstrate (1) that he is represented by an attorney; (2) that he has presented the claim to the opposing party or its duly authorized agent; and (3) that payment for the just amount owed was not tendered to the claimant before the expiration of the thirtieth day after the claim was presented. *See* TEX. CIV. PRAC. & REM. CODE. ANN. § 38.002. A tender generally requires an unconditional offer by an obligor to pay a sum not less than what is due his obligee. *See Baucum v. Great Am. Ins. Co.*, 370 S.W.2d 863, 866 (Tex. 1963).

---

[3](...continued)
plaintiff's asphalt when plaintiff refused to pay the fee and after plaintiff had sent its rail cars to defendant to re-obtain its asphalt, was sufficient to support a finding of malice).

11

But where the obligor insists in good faith and reasonably that the obligee is indebted to him, and where the obligor therefore offers to discharge his obligation to the obligee by offsetting the amount of his demand against that of the obligee, the tender is sufficient.[4]

On December 4, 1991, Equity demanded payment from the Operating Companies and the Bank for the monies allegedly due on the open accounts and security agreements. In response, the Operating Companies each sent Equity a December 11 letter demanding the unaccounted-for seed wheat. The letters, entitled "Demand for unaccounted 1991 Sierra seed wheat," instruct Equity to "consider this letter written notice of an offsetting claim to the debt on account with Perryton Equity." The letters notified Equity of each of the Operating Company's intent to offset the unaccounted-for amounts against the amount of seeds purchased by Equity.

Although the FDIC spends much of its argument defending the *Edson & Hamm* exception to the general tender rule, it misses the point. The December 11 letters are not tenders. Rather, they are demand letters in which each of the Operating Companies responds to Equity's December 4 demand for payment on the open account by indicating that each intends to collect from Equity the amount of

---

[4] *See Edson & Hamm v. Murray*, 285 S.W. 659, 662 (Tex. App.SSBeaumont 1926, no writ); *see also Wilson v. Klein*, 715 S.W.2d 814, 821 (Tex. App.SSAustin 1986, writ ref'd n.r.e.) ("There is, however, this exception to the general rule: the obligor's tender may be valid, even though made upon a condition, provided the condition is one he had a right to impose.").

12

the unaccounted for seed wheat (the conversion claim), less the value of the seeds purchased by Equity. Nowhere in the letters do the Operating Companies express an offer to settle, or even acknowledge, the subject matter of Equity's letterSSthe amounts due on the open account purchases of fertilizer and chemicals for the crops. In contrast, in *Edson & Hamm*, 285 S.W. at 662, the obligor offered to settle his debt to the obligee by offsetting the amount the obligee owed the obligor under an insurance policy with the amount of the outstanding notes owed by the obligor.[5] We therefore affirm the award of attorneys' fees and prejudgment interest.

D.

The FDIC challenges the remand for a calculation of damages Equity's successful claim against the Bank for breach of the subordination agreement. Although the jury concluded that the Bank had in fact breached the agreement, it found that Equity suffered no damages as a result of the breach.

The jury concluded, in interrogatory #2, that the amounts owed to Equity by the Operating Companies under the open account alone totaled more than $42,000, without respect to the counterclaims asserted by the Operating Companies. The maximum amount of the Bank's subrogation to Equity was approximately $49,000. Given the

---

[5] The FDIC's reliance upon *Cadle Co. v. Bankston & Lobingier*, 868 S.W.2d 918 (Tex. App.SSFort Worth 1994, writ denied), is misplaced. The case has nothing to do with § 38.002 tenders, but rather involves the consequences of a party's failure to answer a request for admissions.

13

jury's findings that the Bank breached the subrogation agreement, under which the Bank had agreed to subrogate its interests in the 1991 crops to Equity in exchange for Equity's providing an open account for the Operating Companies' purchase of merchandise and services, and that the amount of money owing under the open account was more than $42,000, there is no reasonable explanation for the jury's conclusion that the breach caused no damages.

The FDIC argues only that the jury could have offset any damages against those it found were owed by Equity to the Operating Companies. This argument is unavailing, however, as jury interrogatory #4 instructs that the amount of damages owed to Equity should be calculated without reference to any offsetting claims of the Operating Companies. We therefore affirm the federal district court's decision to remand for a calculation of damages on jury interrogatory #4.

Accordingly, the judgment of the district court is AFFIRMED IN PART and REVERSED IN PART.[6]

---

[6] Our partial reversal implies no criticism of the federal district court. In entering the judgment that had been issued by the state court of appeals, the district court was following, precisely, the direction we gave in *Meyerland*: "to take the state judgment as it finds it, prepare the record as required for appeal, and forward the case to a federal appellate court for review." 960 F.2d at 520. Thus, any error contained in the judgment was that of the state court of appeals.

HIGGINBOTHAM, Circuit Judge, specially concurring.

I concur, although I remain convinced that we have not properly interpreted the removal provisions of 12 U.S.C. § 1819(b)(2)(B). See Matter of Meyerland Co., 910 F.2d 1247, 1263 (5th Cir. 1991) (dissenting opinion); In re Meyerland, 960 F.2d 512 (5th Cir. 1992) (en banc), cert. denied, 506 U.S. 1049 (1993)(dissenting opinion). Our tortured efforts to construct a pathway to the United States Court of Appeals for cases on the dockets of state appellate courts is palpable evidence that we have not properly interpreted the statute. See, e.g., FDIC v. Keating, 12 F.3d 314 (1st Cir. 1993); RTC v. Nernberg, 3 F.3d 62, 67 (3d Cir. 1994); RTC v. Allen, 16 F.3d 568 (4th Cir. 1994); Lester v. RTC, 994 F.2d 1247 (7th Cir. 1993); Ward v. RTC, 972 F.2d 196, 198 (8th Cir. 1992), cert. denied, 507 U.S. 97 (1993); RTC v. BVS Development Inc., 42 F.3d 1206 (9th Cir. 1994); Jackson v. American Savings Mortgage Corp., 924 F.2d 195, 198 (11th Cir. 1991).

I bow to binding precedent. At some point the United States Supreme Court may examine this process that requires a United States District Court to adopt a state court judgment as its own. This is indeed a curious view of original jurisdiction and congressionally commanded control of judicial power. So much so that to my eyes Congress cannot have intended this result.